ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Endure Industries, Inc. | )   ASBCA No. 64064 |
| | ) |
| Under Contract No. SP0200-22-H-0049 | ) |

APPEARANCE FOR THE APPELLANT:       Mr. Manoj Kumar

APPEARANCES FOR THE GOVERNMENT:      Song U. Kim, Esq.
                                          Associate General Counsel
                                 Weston E. Borkenhagen, Esq.
                                          Trial Attorney
                                          Defense Health Agency
                                          Falls Church, VA

OPINION BY ADMINISTRATIVE JUDGE HERZFELD
ON THE GOVERNMENT'S MOTION TO DISMISS

       Endure Industries, Inc. (Endure), appeals the Defense Health Agency's
(DHA's) decision to cancel Endure's incentive agreement to provide sterilization
packaging supplies.  DHA moves to dismiss Endure's complaint, asserting that
Endure's incentive agreement was not a contract with the government and, thus,
Endure has failed to state a claim upon which relief may be granted.  In its response to
the motion, Endure asserts for the first time that it also has a separate implied-in-fact
contract with the government.  For the reasons discussed below, we dismiss Endure's
appeal.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

       The Defense Logistics Agency's Troop Support (DLA Troop Support) is the
Department of Defense's (DoD) contracting office responsible for supplying
pharmaceuticals, surgical supplies, and medical equipment to DoD's worldwide
medical treatment facilities.  DEFENSE LOGISTICS AGENCY, Working with DLA
Troop Support Medical, https://www.dla.mil/Troop-Support/Medical/Working-with-
Medical/#mpvp (last visited Mar. 19, 2025).  DLA Troop Support contracts with
pharmaceutical and medical/surgical distributers – "prime vendors" – that can deliver,
within 24-hours, supplies ordered by DoD's military treatment facilities at prices
authorized by DLA Troop Support.  *Id.*  DLA Troop Support separately enters
distribution and pricing agreements with manufacturers and suppliers of
pharmaceutical and medical/surgical products.  *Id.*  The distribution and pricing
agreement provides "fair and reasonable" prices for these products, which the prime

vendors may rely on to purchase and distribute the products to military treatment facilities. *Id.*

Endure produces and supplies disposable medical products, including sterilization packaging supplies such as the peel packs for steam sterilization (at issue in this appeal) (compl. ¶¶ 1, 3). Endure registered for a distribution and pricing agreement on DLA Troop Support's website (R4, tab 7). DLA Troop Support approved the agreement on September 21, 2022, which the website lists as the "Contract" effective date under the "Contract Details" part of the website (*id.* at 1). As part of the distribution and pricing agreement, Endure agreed to the terms and conditions provided by DLA Troop Support (*id.* at 2; R4, tab 6). Notwithstanding the terminology on the website, the terms and conditions stated: "The government gives no guarantee that any quantities will be purchased by either Medical Supply Chain or its [Prime Vendor] awardee(s)" and the "issuance of a [distribution and pricing agreement] in no way binds the Government or its awardee(s) to purchase any of the products listed" (R4, tab 6 at 6).

As part of its distribution and pricing agreement with DLA Troop Support, Endure consented and authorized prime vendors (who, as noted above, hold separate contracts with the government) to distribute Endure's products (R4, tab 6 at 2). The terms and conditions warned that "[i]n order to sell products to the Government under the Prime Vendor Program it is essential that [distribution and pricing agreement] holders enter into a distribution agreement with the Prime Vendor" (R4, tab 6 at 3). The distribution agreement between prime vendor and Endure would separately "outline the terms and conditions by which the Prime Vendor is authorized to store, distribute and/or sell" Endure's products (*id.*). Those terms and conditions "shall be consistent with the Prime Vendor's good, commercial (that is, acceptable industry-standard) business practices" and the "Prime Vendor is not required to accept" an "agreement which appears inconsistent with good, commercial business practices" (*id.*). As to commercial specifications, the distribution and pricing agreement between Endure and DLA Troop Support stated, "Packaging, packing and marking shall be in conformance with all applicable laws and regulations" (*id.*).

In February 2023, Endure applied to the Defense Health Agency's Medical Materiel Enterprise Standardization Offices (DHA) for inclusion on the agency's qualified supplier list for sterilization packaging supplies (compl. ¶ 4; app. resp., app'x at 16-20). The distribution and pricing agreement's terms and conditions specifically identify this program, explaining that DHA selects the "vendor offering the best prices . . . to supply the enterprise-wide standardized product line" and the "winning vendor is issued an Incentive Agreement . . . wherein the vendor agrees to provide the standardized products at discounted prices" (R4, tab 6 at 8). The "vendor" here is the supplier (Endure) because suppliers enter incentive agreements, not the "prime vendor" that buys and distributes the qualified products and enters another type of agreement (R4, tab 6 at 7-8; DEFENSE LOGISTICS AGENCY, Working with DLA

2

Troop Support Medical, https://www.dla.mil/Troop-Support/Medical/Working-with-Medical/#mpvp (last visited Mar. 19, 2025).

Based on Endure's competitive pricing and complying with DHA's technical specifications, DHA entered an incentive agreement with Endure on May 15, 2023 (R4, tab 1; compl. ¶ 6; app. resp., app'x at 23 ("You are the lowest priced vendor of those on the Qualified Suppliers List (QSL) for the Sterilization Packaging Supplies, Peel Pack, Steam."). The incentive agreement stated it was "pursuant to" Endure's distribution and pricing agreement with DLA Troop Support and "incorporated by reference" those terms and conditions (R4, tab 1 at 1). The incentive agreement had a five-year term with "estimated effective dates from 01 November 2023 through 31 October 2028" (R4, tab 1 at 2; compl. ¶ 8). Consistent with the distribution and pricing agreement's statement that Endure would supply its product enterprise-wide, the incentive agreement stated, "Each facility agrees to purchase the listed products according to the terms outlined in this agreement" (R4, tab 1 at 1).

In the incentive agreement, Endure agreed "that incentive prices are guaranteed firm for 3 years" (R4, tab 1 at 2). Based on the incentive pricing and "good faith volume estimates" provided by Endure in its qualified supplier listing and the incentive agreement "announcements," DHA stated it would "work[] towards an 80% purchase goal for this product line throughout the life of this agreement" (*id.*). Although DHA stated it "will advertise and promote [incentive agreement] items, the government has no volume commitment or purchase requirement under this agreement, and it is possible that actual sales may not meet the 80% estimate" (*id.*). The agreement reiterated: "The 80% estimate does not create a commitment for the government and therefore the vendor should not rely on that estimate" (*id.*).

As to cancellation, the incentive agreement stated: "This agreement does not represent a contract and may be canceled by either party in whole or in part without cause 30 days after receipt of a written notice" (*id.* at 3). The incentive agreement also stated: "The parties agree that cancellation of the [incentive agreement] is the only recourse available if the [incentive agreement] holder ceases to be satisfied with the level of sales or any other benefit, tangible or intangible, they expected to receive as an [incentive agreement] holder" (*id.* at 2).

Endure began manufacturing and stocking its warehouses with the sterilization pouches made to the government's specific requirements in the incentive agreement (compl. ¶ 11). Endure sold $43,281.60 worth of sterilization pouches to various DoD facilities through a prime vendor (compl. ¶ 10).

Several months into the effective period of the incentive agreement, DHA informed Endure that some end users had two concerns about using DHA's products: (1) Endure's sterilization products included labelling on the porous side of the product, which meant there was a risk that the ink from the label might leak into the product;

and (2) the product expired after six months, which meant an end user would incur additional costs to track when the product expired (compl. ¶ 11 & nn.i, ii; app. resp., app'x at 15). Endure offered to modify its products to comply with these technical concerns (compl. ¶ 12 & n.ii; app. resp., app'x at 14).

On May 31, 2024, DHA issued Endure a notice cancelling the incentive agreement effective July 1, 2024 (R4, tab 4). The notice stated: "Under the terms and conditions of paragraph 5a of the original agreement, which allows the cancellation of this agreement in whole or in part, without cause, by either party, thirty (30) days after receipt of a written notice, this [incentive agreement] is hereby cancelled" (*id.*).

On October 28, 2024, Endure (through its non-attorney representative) filed a complaint at the U.S. Court of Federal Claims alleging three counts: (1) breach of contract based on the cancellation of the incentive agreement; (2) breach of the duty of good faith and fair dealing; and (3) request for declaratory judgment stating that the cancellation provision of the incentive agreement was invalid. *See* Complaint, *Endure Indus., Inc. v. United States*, No. 24-1774 (Fed. Cl.) (ECF No. 1). On October 31, 2024, the court ordered Endure to retain counsel or show cause why the court should not dismiss the case. Order to Show Cause, *Endure Indus., Inc. v. United States*, No. 24-1774 (Fed. Cl.) (ECF No. 5). On November 12, 2024, Endure moved to voluntarily dismiss its appeal without prejudice. Motion to Voluntarily Dismiss, *Endure Indus., Inc. v. United States*, No. 24-1774 (Fed. Cl.) (ECF No. 7); (app. resp., app'x at 4-5). In its motion, Endure stated that government counsel in the case had informed Endure's representatives that the government intended to move to dismiss Endure's case for failure to file a certified claim with the contracting officer. *Id.* at 2. Endure stated it did not file a certified claim because it asserted the government "contracting officer took the position that the 'incentive agreement' with Endure did not constitute a contract." *Id.* On November 19, 2024, the court entered judgment dismissing Endure's case without prejudice. Judgment, *Endure Indus., Inc. v. United States*, No. 24-1774 (Fed. Cl.) (ECF No. 9).

On November 16, 2024, Endure submitted a certified claim to the DLA Troop Support contracting officer and DHA's program manager (the agency official that signed the incentive agreement) (R4, tab 2; app. resp., app'x at 12). As it did at the Court of Federal Claims, Endure alleged that (1) DHA breached the contract based on the cancellation of the incentive agreement, (2) DHA breached the duty of good faith and fair dealing, and (3) the cancellation provision was "unenforceable as unconscionable" (R4, tab 2 at 2). Endure sought "approximately $750,000" for unsold inventory and reinstatement of the incentive agreement (*id.* at 2-3). Endure made no allegations seeking any costs from the government based on fees imposed by a prime vendor under an alleged implied-in-fact contract between the government and Endure (R4, tab 2).

On December 17, 2024, DLA Troop Support's contracting officer responded to Endure's claim (R4, tab 3). DLA Troop Support determined "it was not a party to the Incentive Agreement" and, "[t]herefore, no response on behalf of DLA is required" (*id.*).

On February 2, 2025, Endure filed a notice of appeal with the Board and we acknowledged the notice as Endure's complaint, which alleged three counts (as it did at the Court of Federal Claims and in its certified claim): (1) the government had breached the incentive agreement and the "Incentive Agreement constituted a valid and binding contract between Endure and the United States, as it included all essential elements of a contract, including offer, acceptance, consideration, and mutual obligations;" (2) the government had breached the duty of good faith and fair dealing by changing the requirements of the agreement; and (3) declaratory judgment that the termination provision of the incentive agreement was invalid (compl. ¶¶ 20-32). Again, Endure made no allegations seeking any costs from the government based on fees imposed by a prime vendor under an alleged implied-in-fact contract between the government and Endure.

Counsel for DHA (not DLA Troop Support) noticed an appearance in this appeal. On March 12, 2025, DHA moved to dismiss Endure's appeal, asserting that Endure's incentive agreement was not a contract and, thus, the Board had no jurisdiction over Endure's appeal. In Endure's response, for the first time, Endure asserted it should receive costs from the government based on fees imposed by a prime vendor because the prime vendor was enforcing the government's policies, which created a separate implied-in-fact contract between Endure and the government (app. resp. at 1-5, app'x at 7-10). Also, Endure appeared to rely on a court decision that does not exist and to rely on other court decisions that did not appear to support the propositions for which they were cited. We issued an order to Endure to show cause why we should not strike the brief. Endure responded by acknowledging that it used a generative artificial intelligence program to assist in drafting the brief.

## DECISION

I.    *Endure Has Failed to Plausibly Plead that its Incentive Agreement is a Contract*

A.    *Standard of Review*

DHA has moved to dismiss for lack of jurisdiction, asserting that Endure has failed to plausibly allege a contract between the government and Endure based on the incentive agreement (gov't mot. at 2-7). However, "the determination of whether or not a contract in fact exists is *not* jurisdictional; it is a decision on the merits." *Avue Tech. Corp. v. Sec'y of Health & Human Servs.*, 96 F.4th 1340, 1344-45 (Fed. Cir. 2024) (quoting, with emphasis added, *Engage Learning, Inc. v. Salazar*, 660 F.3d

5

1346, 1355 (Fed. Cir. 2011)); *Robinson*, ASBCA Nos. 63727, 63809, 24-1 BCA ¶ 38,633 at 187,805 (same). Parties and "[c]ourts frequently confuse or conflate the distinction between subject matter jurisdiction and the essential elements of a claim for relief." *Engage*, 660 F.3d at 1353.

To show jurisdiction before the Board, a party need only meet a low bar of non-frivolously alleging a contract. *Avue*, 96 F.4th at 1344-45; *Boeing Co. v. United States*, 968 F.3d 1371, 1383 (Fed. Cir. 2020) ("Allegations of subject matter jurisdiction, to suffice, must satisfy a relatively low standard—must exceed a threshold that 'has been equated with such concepts as "essentially fictitious," "wholly insubstantial," "obviously frivolous," and "obviously without merit."') (quoting *Shapiro v. McManus*, 577 U.S. 39, 45-46 (2015)). However, a challenge to whether a party can actually prove it has a contract with the government constitutes a merits question that may be addressed by a motion to dismiss for failure to state a claim. *Avue*, 96 F.4th at 1345 (stating that "[t]he obligation to *actually* prove the existence of such a contract does not arise until the case proceeds to the merits" (emphasis in original)); *Engage*, 660 F.3d at 1353 ("[T]he failure to state a proper cause of action calls for a judgment on the merits and not for dismissal for want of jurisdiction." (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)).

Here, DHA challenges the merits of Endure's allegations, asserting that Endure has failed to provide "plausible evidence" that a "contract exists between the parties" (gov't mot. at 3-7). For this standard, DHA mainly relies on one of our decisions, which stated that a party "must present at least some plausible evidence of a contract to satisfy . . . . the 'non-frivolous' allegation standard." *Safeco Ins. Co. of Am.*, ASBCA No. 60952, 17-1 BCA ¶ 36,819 at 179,450; *see also Man & Machine, Inc.*, ASBCA No. 61608, 19-1 BCA ¶ 37,401 at 181,811 (same). Recently, however, the Federal Circuit rejected the contention that a contractor must "produce sufficient evidence" of a contract to meet the non-frivolous allegation standard. *Avue*, 96 F.4th at 1345. Thus, DHA has mislabeled its motion as seeking to dismiss for lack of jurisdiction rather than for failure to state a claim.

Given DHA's arguments, we treat its motion as seeking to dismiss Endure's complaint for failure to state a claim. In this regard, Endure (to the extent it even attempted to support its allegations of an express contract) addressed the substantive legal issues raised by DHA's brief and will not be prejudiced. *Nat'l Air Cargo v. United States*, 117 Fed.Cl. 10, 16 (2015) (treating a "motion to dismiss for lack of jurisdiction" as one for failure to state a claim where each party addressed the substantive legal arguments and "neither party would be prejudiced"); *see also Nicolas v. United States*, 35 Fed. Cl. 387, 388 n.1 (1996) ("Because both parties have taken advantage of the opportunity to address the substantive issue of law before the court, re-classifying defendant's motion by correcting its title occasions no prejudice to either party.").

Moreover, the Federal Circuit has stated that a trial court can *sua sponte* dismiss a complaint for failure to state a claim under FED. R. CIV. P. 12(b)(6) without allowing a party to respond: "We . . . have never held that a plaintiff is categorically entitled to an opportunity to oppose a Rule 12(b)(6) motion. To the contrary, we have held that the Court of Federal Claims 'may dismiss *sua sponte* under Rule 12(b)(6), provided that the pleadings sufficiently evidence a basis for that action.'" *M.R. Pittman Grp. LLC v. United States*, 68 F.4th 1275, 1282 (Fed. Cir. 2023) (quoting *Anaheim Gardens v. United States*, 444 F.3d 1309, 1315 (Fed. Cir. 2006)).[1] While Endure had an opportunity to address the substantive legal issues in response to DHA's motion, this appeal would nevertheless present a basis for *sua sponte* consideration of dismissal for failure to state a claim.

Although the Board's rules include no equivalent to FED. R. CIV. P. 12(b)(6) or 12(c), "we permit motions to dismiss for failure to state a claim upon which relief may be granted." *Fluor Intercontinental, Inc.*, ASBCA No. 62550, 22-1 BCA ¶ 38,105 at 185,095. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1365 (Fed. Cir. 2013) (noting that a tribunal "must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant"). "We are not limited to the four-corners of the complaint," and may review "'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned[.]'" *Fluor*, 22-1 BCA ¶ 38,105 at 185,096 (quoting 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. §1357 (3d ed.)); *Lockheed Martin Integrated Sys., Inc.*, ASBCA Nos. 59508, 59509, 17-1 BCA ¶ 36,597 at 178,281; *see also Cotter Corp., N.S.L. v. United States*, 127 F.4th 1353, 1366 (Fed. Cir. 2025) ("We may also look to matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record." (internal quotations and citations omitted)). For example, we may look at the terms of the parties' agreement in assessing whether the complaint (which relies on the agreement) states a claim. *Ute Indian Tribe v. United States*, 99 F.4th 1353, 1364, 1371-74 (Fed. Cir. 2024) (assessing agreement referenced by, but outside, the pleadings on a motion to dismiss for failure to state a claim); *Ace Elec. Def. Sys.*, ASBCA No. 63224, 22-1 BCA ¶ 38,213 at 185,568 ("[W]e consider

---

[1] On appeal, the Federal Circuit has sometimes converted a trial court's jurisdictional dismissal under 12(b)(1) into a dismissal for failure to state a claim under 12(b)(6). *Columbus Rgl. Hosp. v. United States*, 990 F.3d 1330, 1342 (Fed. Cir. 2021) ("If we conclude that Columbus's contract-based allegations fail to state a cognizable claim, we can convert the court's Rule 12(b)(1) dismissal into a Rule 12(b)(6) dismissal.").

the contract's terms in determining whether the complaint asserts a claim upon which relief may be granted.").

### B. *Endure's Incentive Agreement Was not a Contract*

"Not every agreement is a contract." *Trauma Serv. Grp., Ltd. v. United States*, 33 Fed. Cl. 426, 429 (1995), *aff'd*, 104 F.3d 1321 (Fed. Cir. 1997); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 3 cmt. a (1981) ("Agreement has in some respects a wider meaning than contract, bargain or promise. . . . The word 'agreement' contains no implication that legal consequences are or are not produced."). Every agreement that is a government contract must have (1) mutuality of intent to contract, (2) lack of ambiguity in offer and acceptance, (3) consideration, and (4) a government representative with actual authority to bind the United States. *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380-81 (Fed. Cir. 2019). Express or implied-in-fact government contracts must meet these same four requirements. *Id.* at 1381.

In its complaint, Endure asserts that its incentive agreement with DHA constituted a binding contract (with an invalid termination provision) that the government breached by terminating the agreement (compl. ¶¶ 21-22, 32). DHA seeks dismissal, asserting that the agreement lacks (1) mutuality of intent to contract, (2) consideration, or (3) an authorized government agent that signed the incentive agreement. We agree that the incentive agreement is not a contract because it lacks mutuality of intent to contract and consideration.[2]

### 1. The Incentive Agreement Lacks Mutuality of Intent to Contract

The incentive agreement does not demonstrate a mutuality of intent to contract. "As a threshold condition of contract formation, there must be an objective manifestation of voluntary, mutual assent." *Turping v. United States*, 913 F.3d 1060, 1065 (Fed. Cir. 2019) (quoting *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003)); RESTATEMENT (SECOND) OF CONTRACTS § 18 (1981) ("Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance."). Typically, a party can show mutuality of intent by an offer and reciprocal acceptance. *Turping*, 913 F.3d at 1065.

On the other hand, the parties may also show an "absence of mutual understanding" to contract. *Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 551 (Ct. Cl. 1980). For example, a party may state that it intends its assent

---

[2] DHA has also separately and explicitly moved to dismiss for failure to state a claim, asserting that even if the incentive agreement was a contract, the agreement only provided cancellation as a remedy to any breach (gov't mot. at 8-9). Because we conclude that the parties did not enter a contract, we need not address this argument.

to have no legal consequences. 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.7 (3d ed. 2003). This "manifestation of intention that a promise shall not affect legal relations may prevent the formation of a contract." RESTATEMENT (SECOND) OF CONTRACTS § 21 (1981).

Here, the incentive agreement states: "This agreement does not represent a contract and may be canceled by either party in whole or in part without cause 30 days after receipt of a written notice" (R4, tab 1 at 3). The statement that the incentive "agreement does not represent a contract" manifests an objective mutual intent by the parties not to be bound by contract. Moreover, the incentive agreement also states that "the government has no volume commitment or purchase requirement under this agreement" (R4, tab 1 at 2). Similarly, the terms and conditions of the distribution and pricing agreement (incorporated by reference into the incentive agreement) states that the agreement "in no way binds the Government or its [vendor] awardee(s) to purchase any products listed" (R4, tab 6 at 6). While these terms also inform the question of consideration (discussed below), they indicate a lack of mutual intent to enter a contract. Indeed, "[t]he easiest way for a party to make clear an intention not to be legally bound is to say so." 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.7 (3d ed. 2003). These terms indicate an intent by the parties not to be mutually bound by contract. The parties objectively did not mutually assent to contract and, thus, Endure has failed to plausibly plead that it entered a contract with the government.

### 2. The Incentive Agreement Lacks Consideration

The incentive agreement also lacks consideration and that serves as an additional reason to conclude Endure and the government did not enter a contract.

Not every promise constitutes consideration: "To constitute consideration, a performance or a return promise must be bargained for." *Ridge Runner Forestry v. Venneman*, 287 F.3d 1058, 1061 (Fed. Cir. 2002) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 71(1)). "A promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances . . . ." *Crewzers Fire Crew Transp., Inc. v. United States*, 741 F.3d 1380, 1382 (Fed. Cir. 2014) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 77). This is an illusory promise, which means "words in promissory form that promise nothing; they do not purport to put any limitation on the freedom of the alleged promisor, but leave his future action subject to his own future will, just as it would have been had he said no words at all." *Ridge Runner*, 287 F.3d at 1061; *see also* 1 SAMUEL WILLISTON & RICHARD A. LORD, WILLISTON ON CONTRACTS § 4:34 (4th ed., May 2025 Update) ("Words of promise which by their terms make the performance entirely optional with the promisor whatever may happen, or whatever course of conduct in respects the promisor may pursue, do not constitute a promise but form only an illusory promise. This unlimited choice in effect destroys the promise

9

and makes it illusory.") (footnotes omitted). An illusory promise makes performance optional and cannot serve as consideration. *Lee's Ford Dock, Inc.*, ASBCA No. 59041, 16-1 BCA ¶ 36,298 at 177,013 (stating that "[w]ords of promise which . . . make performance entirely optional with the 'promisor'" do not constitute a promise (quoting RESTATEMENT (SECOND) OF CONTRACTS § 77 cmt. a)), *aff'd*, 865 F.3d 1361 (Fed. Cir. 2017)). "[A] valid contract cannot be based upon the illusory promise of one party . . . ." *Crewzers*, 741 F.3d at 1383 (quoting *Ridge Runner*, 287 F.3d at 1062).

In some circumstances, tribunals will find consideration based on a party's obligation "to make a good faith effort" in performance. *Franklin Co. v. United States*, 381 F.2d 416, 420 (Ct. Cl. 1967); *Ingham Reg'l Med. Ctr. v. United States*, 163 Fed. Cl. 384, n.10 (2022) ("A promise conditioned upon an event within the promisor's control is not illusory if the promisor also 'impliedly promises to make reasonable effort to bring the event about or to use good faith and honest judgment in determining whether or not it has in fact occurred'" (quoting 1 CORBIN ON CONTRACTS § 1.17 (2022)). In this regard, Endure has invoked the implied covenant of good faith and fair dealing in its certified claim and complaint (R4, tab 2 at 2; compl. ¶¶ 23-28). "[A] court will not find a contract to be illusory if the implied covenant of good faith and fair dealing can be read to impose an obligation on each party." *Chodos v. West Publishing Co.*, 292 F.3d 992, 997 (9th Cir. 2002).[3]

An implied duty of good faith and fair dealing exists in all contracts, including government contracts, and applies to both the government and private parties. *Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1383-84 (Fed. Cir. 2017) ("An implied duty of good faith and fair dealing exists in government contracts and applies to the government just as it does to private parties."); *Konecranes Nuclear Equip. & Servs., LLC*, ASBCA No. 62797, 24-1 BCA ¶ 38,586 at 187,560. However, the implied duty cannot "be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed.

---

[3] This legal principle is distinct from the separate legal principle that the duty of good faith and fair dealing does not apply to negotiation of a contract prior to award. *See, e.g.*, *Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012) (noting that the covenant of good faith and fair dealing does not apply to "pre-award conduct" because "that duty 'does not deal with good faith in the formation of a contract'") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. c)). While the duty does not apply in pre-contractual negotiations, it does apply in assessing whether an alternative promise in a signed agreement can be found as valid consideration (and not illusory). RESTATEMENT (SECOND) OF CONTRACTS § 77, rep. note c (stating that an alternative promise can be "found good consideration because of the implied duties of good faith (§ 205) and reasonableness of the obligor's satisfaction (§ 228)").

Cir. 2014); *Amatea/Grimberg JV*, ASBCA No. 60426 *et al.*, 23-1 BCA ¶ 38,366 at 186,329 ("This duty is not free-floating but is tied to the explicit terms of the contract."), *aff'd*, No. 23-1700, 2025 WL 1752375 (Fed. Cir. June 25, 2025).

Here, the government has made only illusory promises because it made no promise to buy anything from Endure prior to cancellation of the agreement. *Torncello v. United States*, 681 F.2d 756, 769 (Ct. Cl. 1982) ("It is hornbook law . . . that a route of complete escape vitiates any other consideration furnished and is incompatible with the existence of a contract."). In this regard, DHA points to the incentive agreement's cancellation provision, which allows cancellation "in whole or in part without cause 30 days after receipt of a written notice" (R4, tab 1 at 3; gov't mot. at 8-9). The DHA incentive agreement "automatically expire[s]" if Endure's distribution and pricing agreement with DLA Troop Support "is terminated for any reason" (R4, tab 1 at 3). The distribution and pricing agreement, in turn, also states that it "may be canceled in whole or in part, without cause, by either party, 30 days after receipt of a written notice or sooner as determined by the contracting officer" (R4, tab 6 at 2). Indeed, without some type of purchase commitment, the open-ended cancellation provision would render any promise illusory. *Torncello*, 681 F.2d at 761 (stating that "consideration is furnished" in a requirements contract "by the buyer's promise to turn to the seller for all such requirements"); *Mason v. United States*, 615 F.2d 1343, 1346 n.5 (Ct. Cl. 1980) (stating that, without a buyer's promise to purchase a "guaranteed minimum quantity of goods or services" in an indefinite quantity contract, "the buyer's promise is illusory"); *see also OSC Solutions, Inc.*, ASBCA No. 63294, 23-1 BCA ¶ 38,406 at 186,615-16 (concluding a blanket purchasing agreement, which did not require the government to exclusively purchase from contractor, lacked consideration), *aff'd*, No. 2024-1528, 2026 WL 44221 (Fed. Cir. Jan. 7, 2026).

The incentive agreement included neither a minimum purchase requirement nor required the government to purchase all of its supplies from Endure. When a "good faith" undertaking has served as a basis for consideration, usually the agreement includes a provision requiring an exclusive or semi-exclusive purchase obligation. *See Ace-Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1330-32 (Fed. Cir. 2000) (finding consideration where agreement had standard Federal Acquisition Regulation Requirements clause and "the government promised that it would purchase only from the contractors on the schedule"). Here, however, the incentive agreement states that "the government has no volume commitment or purchase requirement under this agreement" and "[t]he 80% estimate does not create a commitment for the government and therefore the vendor should not rely on that estimate" (R4, tab 1 at 2). Similarly, the distribution and pricing agreement (whose terms and conditions were incorporated in the incentive agreement) explains that "[t]he government gives no guarantee that any quantities will be purchased by either Medical Supply Chain or its [Prime Vendor] awardee(s)" and the "issuance of a [distribution and pricing agreement] in no way binds the Government or its awardee(s) to purchase any of the products listed" (R4,

11

tab 6 at 6).  The distribution and pricing agreement also disclaimed that it was exclusive, stating that DLA Troop Support "ancitipate[d] issuing multiple agreements to firms supplying the same generic types of items" (*id.*).  As with other types of interpretation, we cannot employ a good faith rule to save the agreement "by interpreting it as a requirements contract when it is not so susceptible" or as an indefinite quantity contract when "it lacks a minimum quantity term."  *Coyle's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302, 1305, 1306 (Fed. Cir. 1998); *see also Flood v. ClearOne Commc'n, Inc.*, 618 F.3d 1110, 1121 (10th Cir. 2010) ("None of this is to say that the implied covenant of good faith and fair dealing is a magic wand that, once waved about, can *always* rescue a contractual term from being held illusory.  Or that the covenant may be used as a subtler way to rewrite the parties' deal and decline to give effect to express contractual terms.") (Gorsuch, J.).

Ultimately, the incentive agreement lacks consideration from the government and served only as Endure's standing offer providing a "framework and terms for future orders[.]"  *Patriot Pride Jewelry, LLC*, ASBCA No. 58953, 14-1 BCA ¶ 35,624 at 174,478;  *see also Zhengxing v. United States*, 204 F. App'x 885, 886-87 (Fed. Cir. 2006) ("The BPA, at issue, however, is merely a framework for future contracts and only creates a contractual obligation with regard to accepted orders.");  1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.7 (3d ed. 2003) ("Even if a promise is unenforceable because the promise given in return is illusory . . . . the seller's promise may be regarded as a continuing or a 'standing' offer, so that a new contract is formed each time that the buyer accepts by placing an order.").  Thus, Endure has failed to plausibly plead that it had a contract with the government because the incentive agreement lacked consideration.

### 3.  It is Unclear Whether an Authorized Government Agent Executed the Incentive Agreement

DHA also asserts a third reason why the incentive agreement did not constitute a contract between the government and Endure.  DHA asserts that DHA's program manager was not a contracting officer and, thus, was not an authorized government agent to make a contract when she signed the incentive agreement (gov't mot. at 7).  However, an appellant need only plausibly allege in its complaint that an appropriate official signed the agreement and has no duty to prove that the government employee was an authorized agent to contract for the Federal government.  *Avue*, 96 F.4th at 1344.  From the face of the complaint and the incentive agreement, it is unclear what authority the program manager had.[4]  Thus, Endure has plausibly pleaded that an

---

[4] It is unclear whether DLA Troop Support or DHA is the proper agency here, because a program manager from DHA signed the incentive agreement but a DLA Troop Support contracting officer responded to Endure's request for a contracting officer's determination, albeit denying that DLA Troop Support had

authorized agent executed the contract, and this is not a basis for granting the government's motion. Instead, as noted above, we conclude the lack of mutuality of consent to contract and lack of consideration each demonstrate that Endure has failed to plausibly plead a contractual relationship between the parties.

II. *The Board Lacks Jurisdiction Over Endure's Implied-in-Fact Contract Argument*

In its response to DHA's motion to dismiss, Endure now claims for the first time that it had a separate implied-in-fact contract with the government based on Endure's agreement with the prime vendor because the prime vendor was enforcing the government's policies (app. resp. at 1-5). We lack jurisdiction over this new claim because Endure never presented it to a contracting officer.

Endure, as the proponent of the Board's jurisdiction, bears the burden of establishing jurisdiction by a preponderance of the evidence. *Anthony & Gordon Constr. Co.*, ASBCA No. 61916, 21-1 BCA ¶ 37,887 at 184,000; *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1004 (Fed. Cir. 2015).

Pursuant to the CDA, "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision." 41 U.S.C. § 7103(a)(1); *Lee's Ford Dock, Inc. v. Sec'y of Army*, 865 F.3d 1361, 1369 (Fed. Cir. 2017). The claim submitted to a contracting officer for a final decision defines the scope of an appeal before the Board. *Anthony & Gordon*, 21-1 BCA ¶ 37,887 at 184,000. "[O]btaining a final decision on a claim is a jurisdictional prerequisite to adjudication of that claim" before the Board. *Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 776 (Fed. Cir. 2021); 41 U.S.C. §§ 7103(a)(3), 7104(a). "The purpose of the requirement is 'to create opportunities for informal dispute

---

a contract with Endure (*compare* R4, tab 1 (incentive agreement), with tab 3 (contracting officer's response)). Endure submitted its certified claim to both the DHA program manager – its primary contact at DHA, who the government alleges was not a contracting officer – and the DLA Troop Support contracting officer (app. resp., app'x at 12). Although DHA never responded (only DLA Troop Support did), Endure has met the submission requirement under the CDA even if the DHA program manager was not a contracting officer (as the government alleges here). 41 U.S.C. § 7103 (a)(1) ("Each claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision."). "[T]he requirement of submitting a claim to the [contracting officer] is satisfied if the contractor sends a proper claim to its primary contact with a request for a [contracting officer's] decision and a reasonable expectation that such a request will be honored." *Gardner Zemke Co.*, ASBCA No. 51499, 98-2 BCA ¶ 29,997 at 184,355 (citing *Neal & Co. v. United States*, 945 F.2d 385, 388-89 (Fed. Cir. 1991)).

13

resolution  at the contracting officer level and to provide . . . clear notice as to the' content of 'contract claims.'" *Tolliver Grp.*, 20 F.4th at 776 (quoting *Raytheon Co. v. United States*, 747 F.3d 1341, 1354 (Fed. Cir. 2014)).  Thus, the Board does not possess jurisdiction over new claims that appellant raises for the first time on appeal and never previously submitted to the contracting officer for decision.  *Frazier Inv., Inc.*, ASBCA No. 63001, 23-1 BCA ¶ 38,313 at 186,045.

This Board does not possess jurisdiction to consider an appeal that presents a "'materially different factual or legal theory' of relief" requiring that we "'focus on a different or unrelated set of operative facts'" than was presented to the contracting officer.  *Lee's Ford Dock*, 865 F.3d at 1369 (quoting *K-Con*, 778 F.3d at 1006, and *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990)).  Conversely, "[n]o new claim arises by introduction of a new legal theory of recovery, additional facts that do not alter the nature of the original claim, or a dollar increase in the amount claimed, so long as the theory, facts, or dollar increase rely on the same operative facts included in the original claim."  *Anthony & Gordon*, 21-1 BCA ¶ 37,887 at 184,001.

In its claim (and complaint), Endure focuses on the incentive agreement, seeking "approximately $750,000" for unsold inventory, a determination that the incentive agreement's termination provision was "unenforceable as unconscionable," and reinstatement of the incentive agreement (R4, tab 2 at 2-3; compl. ¶¶ 19-35).[5]

In its response to DHA's motion to dismiss, Endure now asserts an entirely new theory it never raised in its certified claim.  Endure now asserts that it should receive costs from the government based on fees imposed by a prime vendor as a government agent, resulting in an alleged implied-in-fact contract between the government and Endure (app. resp. at 1-5, app'x at 7-10).  Endure entered a separate agreement with the prime vendor to enable sale of its products (R4, tab 6 at 3).  The distribution and pricing agreement between Endure and DLA Troop Support explained that the terms and conditions between Endure and the prime vendor "shall be consistent with the Prime Vendor's good, commercial (that is, acceptable industry-standard) business practices" (R4, tab 6 at 3).  Endure asserts that the government enabled the prime

---

[5] In the past, using "approximately" to qualify the claim amount would have resulted in an appeal's dismissal for lack of jurisdiction due to a lack of a sum certain. *Ford Lumber & Bldg. Supply, Inc.*, ASBCA No. 61618, 20-1 BCA ¶ 37487 at 182,089-90 (discussing *M.J. Hughes Constr., Inc.*, ASBCA No. 61782, 19-1 BCA ¶ 37,235 at 181,235).  More recently, the Federal Circuit has stated that "the requirement to state a sum certain in submitting a claim under the CDA is a mandatory, nonjurisdictional requirement subject to forfeiture" that must be challenged as a failure to state a claim. *ECC Int'l Constructors, LLC v. Sec'y of Army*, 79 F.4th 1364, 1380 (Fed. Cir. 2023).  Here, the government has not challenged the sum certain amount.

vendor to impose requirements on Endure that resulted in losses (app. resp. at 2-3). For example, Endure asserts it "was penalized" by the prime vendor for using the United States Postal Service instead of private carriers (such as United Parcel Service or Federal Express) and the "fines imposed exceeded the value of the shipment" (app. resp. at 2 n.2).

Endure's implied-in-fact contract theory (based on an agency relationship between the prime vendor and the government) is entirely different from what it asserted in its certified claim. Endure's new theory is not based on the same operative facts as its certified claim, which exclusively referenced the incentive agreement, not its agreement with the prime vendor. Also, the legal theory is distinct. To prove its agency theory, Endure would likely have to show that (1) the prime vendor was acting as the purchasing agent for the government, (2) the agency relationship between the government and the prime vendor was established by clear contractual consent, and (3) the contract stated that the government would be directly liable to Endure. *See United States v. Johnson Controls*, Inc., 713 F.2d 1541, 1551 (Fed. Cir. 1983) (involving appeal from this Board); *see also Wolf Creek R.R. LLC v. United States*, No. 2024-1873, 2025 WL 3276822 at *5 (Fed. Cir. Nov. 25, 2025); *Frontline Support Solutions, LLC*, ASBCA No. 64022, 25-1 BCA ¶ 38,803 at 188,731 (recognizing the agency theory as one exception to the "privity requirement for subcontractors"). Again, this legal theory and the operative facts necessary to prove it are distinct from the legal theory and operative facts that Endure presented in its certified claim.

Endure never gave the government's contracting officer a chance to respond to this theory. *Tolliver Grp.*, 20 F.4th at 776 ("The focus is on whether the contracting officer was given 'an ample pre-suit opportunity to rule on a request, knowing at least the relief sought and what substantive issues are raised by the request.'" (quoting *K-Con*, 778 F.3d at 1006)). Thus, we lack jurisdiction to hear this newly raised claim.

III.     *Endure Used Generative Artificial Intelligence to Prepare its Brief, which Resulted in Hallucinated and Questionable Legal Citations*

In its response to DHA's motion to dismiss, Endure appeared to rely on a court decision that does not exist and to rely on other court decisions that did not appear to support the propositions for which they were cited. After DHA noted this in its reply, we issued an order to Endure to show cause why we should not strike the brief, requesting that it provide a copy of the decision we could not locate, "*BMS, Inc. v. United States*, 12 Cl. Ct. 33 (1987)," noting that another case was reported near the volume and page citation – *Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1 (1987). We also asked Endure to support its assertions regarding three decisions that we could find: *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724 (Fed. Cir. 1997); *Russell Corp. v. United States*, 537 F.2d 474 (Ct. Cl. 1976); and *PGBA, LLC v. United States*, 389 F.3d 1219 (Fed. Cir. 2004). We also inquired whether Endure used generative artificial intelligence (AI) to assist in preparing the brief.

15

Endure responded by acknowledging that it used a generative AI program to assist in drafting the brief and acknowledged that one of the court decisions it cited did not exist: "*BMS, Inc. v. United States*, 12 Cl. Ct. 33 (1987)." Generative AI programs – at least in their current state – have a tendency to hallucinate non-existent cases. *Sanders v. United States*, 176 Fed. Cl. 163, 169 (2025) ("It is no secret that generative AI programs are known to 'hallucinate' nonexistent cases, and with the advent of AI, courts have seen a rash of cases in which both counsel and *pro se* litigants have cited such fake, hallucinated cases in their briefs."); *Raven Investigations & Sec. Consulting, LLC*, B-423447, 2025 CPD ¶ 81 at 3 ("[T]he use of AI programs to draft or assist in drafting legal briefs can—and seemingly often does—result in the citation of non-existent cases."); *see also* Ralph Nash, *Artificial Intelligence Hallucinations: Sanctions are Waiting*, 39 NASH & CIBINIC REP. ¶ 44 (Aug. 2025) ("[I]t is well known that so far AI programs tend to hallucinate.").

The real decision near the hallucinated citation is *Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1 (1987). "Fake cases generated by AI often have reporter citations that lead to cases with different names, in different courts, and about different subjects." *Sanders*, 176 Fed. Cl. at 169 n.8. Endure asserts that the *Johns-Manville* decision supports the assertions made in its brief that it originally attributed to the fake *BMS* case. And, by luck, *Johns-Manville* does lay out one of the statements it attributed to the fake BMS decision – the requirements to demonstrate an implied-in-fact contract. *Johns-Manville*, 12 Cl. Ct. at 20. Elsewhere, the case is less on-point. Relying on the fake *BMS* decision, Endure's brief asserts that "[c]ourts have consistently rejected similar attempts by the government to evade contractual liability while exercising control over contract obligations" and "undisclosed procurement obligations were later enforced through financial penalties and operational restrictions, despite not being set forth in" the incentive agreement (app. resp. at 3-4). Endure asserts that portions of the *Johns-Manville* decision support these assertions. But, far from "consistently" ruling in favor of a contractor, *Johns-Manville* ruled against the contractor as to whether an implied-in-fact contract existed. *Johns-Manville*, 12 Cl. Ct. at 35-36 (dismissing "claims for express and implied-in-fact contract"). Also, the allegedly supportive legal statements from the decision Endure quotes in its response to show cause order (ex. at 1-2), derive from alleged facts from the contractor's complaint or proposed findings (not the court's legal rulings); and the court expressed skepticism of these statements because they "can be read to set forth elements of a classic implied-in-law contract that is beyond the jurisdiction of this court to consider." *Johns-Manville*, 12 Cl. Ct. at 18. This Board, like the Court of Federal Claims, generally has no jurisdiction over contracts implied-in-law. *Relyant Global LLC*, ASBCA No. 63024, 22-1 BCA ¶ 38,205 at 185,539.

Other decisions Endure cites do not support its contentions even though the decisions are "real," which may be a more concerning issue. *See Seither & Cherry Quad Cities, Inc. v. Oakland Automation, LLC*, No. 23-111310 *et al.*, 2025 WL

16

2105286 at \*1 (S.D. Mich. July 28, 2025) ("The court also notes that the mere fact that the cases themselves that counsel cited were not fictitious (rather, only the quotes or parentheticals) does not help matters; if anything, it highlights the risks of AI usage and reliance on these tools. When a case cite is 'real,' an attorney, or for that matter a judge, might see a case they recognize and assume the quote or holding has been accurately represented, where a case that an attorney does not recognize might, at least at first blush, trigger more exacting scrutiny.").

In particular, Endure seeks to support the statement that the "government cannot impose detailed procurement controls, financial penalties, and mandatory compliance obligations while simultaneously denying the existence of a contractual relationship," by citing *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724 (Fed. Cir. 1997). Yet, in that case, neither party denied the existence of a contract and, in fact, had an express contract – the dispute was about the interpretation of the terms of that express contract. *Id*. at 730-32.

Endure asserts that the U.S. Court of Claims (predecessor to the Federal Circuit) "held that when the government directs procurement terms and supplier obligations, an implied-in-fact contract exists, even if not formally documented" in *Russell Corp. v. United States*, 537 F.2d 474 (Ct. Cl. 1976). The Court of Claims did not "hold" this,[6] but instead found against the alleged contractor and concluded that "no contract was made and defendant [the government] has no obligation to pay damages for breach." *Id.* at 485.

---

[6] A tribunal's holding is the legal principle of an opinion, which includes "not only the result, but also those portions of the opinion necessary to that result by which we are bound" (such as the *ratio decidendi* – the reasoning of the decision). *Seminole Tribe v. Fla.*, 517 U.S. 44, 67 (1996); *see also Alexander v. Sandoval*, 532 U.S. 275, 282 (2001) (stating that tribunals are "bound by holdings, not language"). *Obiter dicta* (or *dicta*) is language that is unnecessary for the resolution of a case and is not binding in future cases (although it may be persuasive). *Cohens v. Va.*, 19 U.S. (6 Wheat.) 264, 399 (1821) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."). It is important to "distinguish an opinion's holding from its dicta." *U.S. Nat'l Bank of Ore. v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 463 n.11 (1993). Admittedly, one judge's *dicta* may be another's holding. *See, e.g.*, *Seminole Tribe*, 517 U.S. at 66-67 (majority and dissenting opinions disagreeing whether prior language from a ruling was *dicta* or holding); *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 613 n.2 (1990) (justices debating whether prior language from a ruling was *dicta* or holding). Thus, a party should be careful in describing statements from a prior ruling as the "holding."

Endure also asserts that the "procurement structure itself was deliberately designed to favor only the incumbent vendor, rendering Endure's opportunity for meaningful participation illusory and effectively impossible from the start" by citing *PGBA, LLC v. United States*, 389 F.3d 1219 (Fed. Cir. 2004). *PGBA* does not support Endure's statement in its brief. *PGBA* is a bid protest decision involving a disappointed offeror (that happened to be an incumbent) challenging an awarded contract. *Id.* at 1222-23. While sometimes legal principles from protest decisions may overlap with contract disputes, we have been unable to find the relevance of the holding in *PGBA* to Endure's appeal based on the briefing. To the extent Endure seeks to protest the structure of the agency's procurement, this Board has no jurisdiction over bid protests. *Siemens Gov't Tech., Inc.*, ASBCA No. 62601, 22-1 BCA ¶ 38,136 at 185,245, *aff'd*, No. 2022-2240, 2024 WL 2043201 (Fed. Cir. May 8, 2024); *Spanish Solutions Language Servs.*, ASBCA No. 62233, 20-1 BCA ¶ 37,527 at 182,241.

The Board's rules permit the imposition of sanctions where a "party fails to obey an order issued by the Board" and "it considers necessary to the just and expeditious conduct of the appeal." ASBCA Rule 16. Though our Rule includes no standard for assessing sanctions, we have looked to FED. R. CIV. P. 11 for guidance in assessing sanctions (whether it involves violation of an order or not). *Huffman Constr., LLC*, ASBCA Nos. 62591, 62783, 25-1 BCA ¶ 38,932 at 189,484 (citing *Globe Constr. Co.*, ASBCA No. 21365, 78-2 BCA ¶ 13,486 at 66,005, *aff'd*, 230 Ct. Cl. 957 (1982)). Among other things, Rule 11 states that representations to the tribunal in a pleading, written motion, or other paper means "an attorney or represented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the claims, defenses and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." FED. R. CIV. P. 11(b)(2); *see also Huffman*, 25-1 BCA ¶ 38,932 at 189,484. This standard imposes "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and that the applicable standard is one of reasonableness under the circumstances." *Business Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991). Rule 11 requires that "attorneys read, and thereby confirm the existence and validity of, the legal authorities on which they rely . . . to ensure that the arguments are based on those authorities are 'warranted by existing law,' FED. R. CIV. P. 11(b)(2), or otherwise 'legally tenable.'" *Huffman*, 25-1 BCA ¶ 38,932 at 189,484 (quoting *Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024), and *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)).

Similarly, parties appearing before this Board have a duty of candor that includes accurately citing legal and factual sources. Professional rules of conduct disallow a counsel from knowingly making "a false statement of fact or law to a tribunal" or failing "to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Model Rules of Professional Conduct 3.3(a)(1);

18

*Level 3 Commc'ns, LLC v. United States*, 724 F. App'x 931, 934 (Fed. Cir. 2018) (quoting Model Rule 3.3(a)(1)); *see also Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1486 (Fed. Cir. 1984) (awarding costs based on a parties' citations that were a "[d]istortion of the record" and violated duty of candor). Given such a breach of conduct by counsel, tribunals can refer the matter to the relevant state bar for discipline, strike the filing, or disqualify counsel from the case. *Johnson v. Dunn*, 792 F. Supp. 3d 1241, 1267-68 (N.D. Ala. 2025) (disqualifying counsel and referring matter to state bar); *Powhatan County School Bd. v. Skinger*, No. 24-cv-874, 2025 WL 1559593 at *10 (E.D. Va. June 2, 2025) ("If a lawyer or law firm engaged in the conduct in which [*pro se*] has engaged, the lawyer would be sanctioned, perhaps monetarily or with an order to pay the opponent's fees, perhaps by the entry of an adverse judgment or by removing the lawyer's privilege to practice law.").

Endure has chosen to use a non-lawyer company representative to act for the company *pro se* as permitted by our rules. ASBCA Rule 15(a). We give some procedural leniency to *pro se* litigants. *Steffen v. United States*, 995 F.3d 1377, 1380 (Fed. Cir. 2021). "But procedural leniency toward a specific class of litigants does not translate to unfettered deference and dereliction of judicial review." *Steffen*, 995 F.3d at 1380. Being *pro se* does not relieve a party from assuring the accuracy of citations that a party learns about while using generative AI. The citation of misleading or fake sources results in a waste of an opposing party's and this tribunal's resources. *Sanders*, 176 Fed. Cl. at 169. It undermines our ability to meet the statutory obligation to "provide informal, expeditious, and inexpensive resolution of disputes." 41 U.S.C. § 7105(g)(1). Indeed, as of July 16, 2025, our website has included a warning to parties regarding the use of AI:

> The Board does not prohibit the parties from using artificial intelligence (AI) tools to assist in drafting filings before us. Nevertheless, regardless of the means that a party uses to draft such filings, the party is responsible to ensure that they accurately reflect the facts and the law. We caution the parties that the current generation of AI tools are known to sometimes create materially false characterizations of legal precedent, misquote cases, and even create non-existent case citations. Thus, any party which uses AI tools to assist in drafting filings before the Board is expected to take independent steps to ensure the accuracy of such filings and may be subject to appropriate sanctions if their filings mischaracterize the law, misquote cases, or cite to nonexistent cases.[7]

---

[7] ARMED SERVICES BOARD OF CONTRACT APPEALS, https://www.asbca.mil/Use-of-AI/ (last visited on November 26, 2025).

"A tribunal is afforded considerable discretion in determining whether sanctions are appropriate, and if so, what particular sanctions are appropriate under the circumstances of each case." *Gen. Dynamics Ordnance & Tactical Sys., Inc.*, ASBCA No. 56870, 12-1 BCA ¶ 34,944 at 171,806. In assessing whether to impose sanctions and, if so, what type, we look at willfulness, prejudice to the parties, burden and expense incurred by the parties and this tribunal, bad faith, and callous disregard of responsibilities. *Huffman*, 25-1 BCA ¶ 38,932 at 189,485.

"Our power to impose sanctions is broad and may even extend to dismissal of an appeal." *Envt'l Safety Consultants, Inc.*, ASBCA No. 58343, 14-1 BCA ¶ 35,786 at 175,050 (quoting *Turbomach*, ASBCA No. 30799, 87-2 BCA ¶ 19,756 at 99,953-54); *see also Avant Assessment, LLC v. Sec'y of Army*, 752 F. App'x 1000, 1003 (Fed. Cir. 2018) ("[T]he case management authority of the ASBCA's administrative law judges is no different from that of federal trial courts which, by virtue of their case management authority, are given broad discretion to manage the litigation on their dockets.") (quoting *Metadure Corp. v. United States*, 6 Cl. Ct. 61, 67 (1984)). Lesser sanctions (than dismissal) have prohibited a sanctioned party from introducing evidence or calling witnesses; or drawn adverse inferences against a party. *Envt'l Safety*, 14-1 BCA ¶ 35,786 at 175,050. We may also strike a filing as a sanction. *Huffman*, 25-1 BCA ¶ 38,932 at 189,485; *Jeffrey C. Stone, Inc.*, ASBA No. 58372, 15-1 BCA ¶ 36,112 at 176,294 (considering striking a pleading, but denying the motion when the party mooted the concern by conceding the issue). The Board has determined that it lacks authority to impose monetary sanctions. *Huffman*, 25-1 BCA ¶ 38,932 at 189,485.

In our show cause order, we stated that the Board might strike Endure's brief. As reflected above in our discussion of the parties' substantive legal arguments, Endure's brief seems to have done more harm than good by advancing the untenable implied-in-fact contract argument and effectively surrendering to the government's argument that, by its terms, the incentive agreement was not a contract. Thus, in the limited facts before us, with a *pro se* litigant who did not appear to recognize the risks it had taken, we have chosen not to strike Endure's entire brief as a sanction for using fake and inaccurate legal citations. Instead, we have simply ignored the fake and inaccurate legal citations in its brief and weighed the remaining arguments that are supported by accurate citations. No future litigant – *pro se* or not – should take this to mean that they, too will avoid greater consequences if they rely on AI to their detriment: the Board's advice on the website is just one of many new, strong, and conspicuous signals putting litigants on notice that AI is imperfect and not a tool that excuses compliance with our rules. Had Endure's brief been submitted a few months later, the negative consequences may well have been different.

CONCLUSION

We dismiss, with prejudice, Endure's appeal regarding the incentive agreement because Endure has failed to state a claim upon which relief may be granted. We dismiss, without prejudice, Endure's newly-raised claim of government liability for Endure's alleged losses incurred in supplying orders to the prime vendor because Endure failed to raise this claim before the contracting officer.

Dated: March 23, 2026

DANIEL S. HERZFELD
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

DAVID D'ALESSANDRIS
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 64064, Appeal of Endure Industries, Inc., rendered in conformance with the Board's Charter.

Dated: March 23, 2026

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals